Good morning. I just want to say one thing. You look great out there. And we are very honored this morning to have visitors from Holland, from the Netherlands, from Belgium. All the same, right? From Belgium. Judge Hamilton's beautiful wife and beautiful in-laws. So everyone has to behave today, not like every other day. All right, let me just call the case and we will get to work. The case is 16-N, 16-18-96, Grede v. FCStone, LLC, and it's Ms. Stieke. May it please the Court. Both the United States Supreme Court and this Court have repeatedly held that an order that was incorrectly decided does not make that order void or rob the order of its preclusive effect if the parties do not appeal it. Therefore, even though this Court held in the first appeal in this case that the bankruptcy court did not correctly decide the October 28th order, because FCStone did not appeal the October 28th, 2008 order, that order was entitled to preclusive effect. Ms. Stieke, was there any indication in the prior appeal that you were preserving this defense? Your Honor, we preserved it in the trial court. I asked in the appeal. Was there any indication that this was all a pointless exercise as far as you were concerned? Your Honor, we were the appellee. The district court judge did not rule based on collateral estoppel. He ruled on the terms of the order. Was there any indication? No, we did not raise it, Your Honor. We were not required to. I understand your arguments. Can you point us to any cases where a court has applied collateral estoppel when that defense was raised after the court had already declared the question to have been wrongly decided? Yes, Your Honor. United States Student Aid Fund v. Espinoza. There the court applied collateral estoppel even though the confirmation order that the bankruptcy judge entered was entered in order. In error, you mean? Yes, it was entered wrongfully. Everybody understands that collateral estoppel, when it applies, applies whether the decision was correct or not. But in that case, had the court already decided that the plan was in order? No, I'm sorry, Your Honor. I misunderstood your question. Any cases where collateral estoppel is raised after the merits have been decided? But, Your Honor, the merits of the... Can you direct us to any? This would be an extraordinary situation. I don't think so, Your Honor. I can't. Give me an example. If I understand your hypothetical, what you're saying is... It is not a hypothetical question. I'm asking whether you can point us to an application of collateral estoppel to a decision a court has already held erroneous on direct appeal. No, Your Honor. But the rule with regard to an appellee, a rule which we relied upon in preparing our briefs as set forth in the Doar Systems case and Frank v. Walker, is that an appellee does not need to raise alternative arguments on appeal. And the reason for that is that you don't want to unnecessarily complicate appeals. There were lots of issues in the last appeal the judge had held that the bankruptcy judge had not abused his discretion, and he looked to the October 28th order to interpret the August 20th order. So he really ruled on the merits of the August 20th order, not with regard to the October 28th order, and this court disagreed, and we accept that you disagreed. So the briefs here then indicate that, what, a strategic misjudgment in the briefing back in 2013? I don't know if it was a strategic misjudgment, Your Honor. I mean, under the rule that the court is advocating that certain types of issues, if raised alternatively, must be raised by the appellee would create a rule where no one would risk not raising everything. And then you would have every alternative argument that was ever made at any time during the case complicating the brief of the appellee just to make certain that if there was an error, it would be preserved and would be presented in that appeal. In retrospect, had we brought collateral estoppel, maybe there would have been a different outcome in the appeal, but we weren't obligated to do that. Counsel, could I ask you, this was a pretty unusual ruling. Your theory here is that F.C. Stone lost its rights by failing to appeal the denial of your 60B motion, and the judge's oral musings about his subjective intentions with respect to the August 20 authorization order. I guess I'm interested in knowing whether there are comparable examples of collateral estoppel being applied to a judge's subjective intentions about whether he intended to do what his order actually did. Your Honor, this wasn't musings. There was a motion that was filed that sought Rule 60 relief either through vacation or clarification of the order. The judge entered a written order incorporating his decision after extensive briefing by the party. And his oral statements were, in essence, to the effect that that's not what I meant to do, right? And it's not as though there was an ambiguity he was clarifying in the language. He was trying to add a new qualification or limitation, right? I did not intend to preclude in the order of August 20 those claims under Section 549. I think what he was saying, as I read his comments based on the briefing and the rest, is he was saying the parties were briefing Paragraph 3 of that order as they did in the first appeal. And they were arguing the F.C. Stone side of the case, the Seg. 1 group, that that particular provision provided that they were allowed to make this defense in the 549 action. And he was saying, I didn't intend in this language to do this. And think back to how that order came to be. Judge Squires told the parties, I am not going to foreclose litigation. The parties went out into the hallway, including F.C. Stone's lawyers. They drafted up an order. I doubt they thought about the with respects and the commas and all the rest of it. They handed it to the judge. He understood. They were there. No one was misled. It's not like the Mendez case that was cited in Your Honor's first decision, where you have a third party who wasn't in court, a bank, who's being faced with a conditional judgment for a hearing they didn't hear and wouldn't have known of the mistake. And then they litigate. They turn course on that. And they come in and they say, what you told us you were doing, what we drafted an order to do, it really didn't mean that. And he says, that's not what I intended here. And we, Judge Zagel accepted that as not an abuse of discretion. And we went with that issue and how he resolved the case. Because as an appellee, we were dealing with multiple different issues raised. We didn't have the space in the brief to raise every alternative argument. And we thought the decision was correct. Go ahead. Well, I'm changing the subject. F.C. Stone says your expert conceded that he wasn't hired to trace customer assets and that he didn't review or rely on Sentinel's customer ledger. Doesn't that mean that the analysis that was provided by Ms. McCloskey, F.C. Stone's expert witness, is essentially unrebutted? No, it doesn't, Your Honor. Our expert, they're not correct in how they describe what he did. What he did is he testified that it was essentially impossible, based upon the sets of books that Sentinel kept, the way that it moved funds around, the way that the clearing account worked, where pretty much every dollar that went in, that was where the Bank of New York took its money out to be paid on its loan, went elsewhere rather than the purchase of securities, that it was impossible to segregate. And on that burden of proof issue that they raised, we think, for the first time in this reply brief in this court, the case they cite, the Tri-River case, and what is established under 541 and 541D, is once the trustee shows, which we did, that this account was titled in Sentinel's name and in Sentinel's possession, Sentinel had legal title to it, it was their burden of proof, and that's the case they cite. It's their burden of proof to prove by the preponderance of the evidence that they had a trust. Is it true that James Feltman did not even attempt to trace customer assets? What he testified, he didn't. Is it true? He didn't trace customer assets because one couldn't trace customer assets, and he testified as to why that could not be done, that Ms. McCluskey's analysis wasn't a tracing either. She didn't do it either. As she testified at page 1144 of the transcript, when talking about what Mr. Feltman did, she said, of course he didn't trace F.C. Stone's money to a particular asset, because that couldn't be done. What she did is she said, did these securities, at the end when the music stopped, after they had been moved around to being the bank's collateral, Seg 3 fund, every place else in the world, she said these accounts were in an account called a Seg 1 account. She didn't trace either. No one did. Is his deposition testimony in the record anywhere? I don't know if it was designated into the record. Because neither party has tendered it to us. I could not find it anywhere. I mean, he testified at trial, so I don't know that it would have been part of the trial exhibits. We could certainly check that. Counsel, can I ask you about the statutory trusts that at least are of significant concern to me? Do we have any indication as to whether the so-called Seg 3 customers could have asserted the kinds of claims and sought the sort of reserves that the Seg 1 customers sought? Well, there wasn't anything left for them to do. What Seg 1 is claiming is that what was left in the account called Seg 1, we should get that because the account is called Seg 1. For the Seg 3s, there wasn't anything left in their accounts because those securities got pledged to the Bank of New York. Well, here's what I'm concerned about. I'm troubled by the idea that the statutory trusts could be defeated for the benefit of secured lenders like the Bank of New York by Sentinel's management's fraud and the commingling that happened. And what I would suggest is why isn't the appropriate solution here that both Seg 1 and Seg 3 customers, in essence, should have assets that are nominally under the control of Sentinel as a trustee, treated not as property of the estate, but as a collective set of assets that should go first to the Seg 1 and Seg 3 customers under the statutory trusts? Well, that's essentially the result that Cunningham v. Brown provides for. It doesn't distinguish between how you get to your trust claim, and the Bankruptcy Code doesn't distinguish as to how you get to your trust claim. Essentially what FC Stone and its amicus argue by arguing for this floating trust is they are arguing that we should treat this as a case under the subpart rules dealing with FCMs, Chapter 7. But Section 103 makes it clear you can't use those rules here. And so because this was a Chapter 11 case, and Judge Zagel said it wouldn't have been an FCM Chapter 7 anyway. If anything, it would have been under the SEC rules, and then the Seg 3 parties could have argued that they were superior. Because you're under the bankruptcy rules, we're stuck with the priorities that are provided for in 726, which would put them as unsecured creditors with the other creditors. Now, the other unsecured creditors besides Boney are de minimis. Their utilities are very small amounts that make no difference to the distribution. Boney does, and we attempted to use the one tool available to us to subordinate them, Section 510C. And yes, we thought they should be subordinated. I understand. But for us to argue that they should be, we can't, because this court has ruled and this court decides matters. So what they're really arguing is for this court to rewrite the statute. And if Congress wanted to do that, it could have put in the CEA or in the IAA, or it could have put in the Bankruptcy Code a rule that says whenever there's a defalcation of customer property, there is a floating lien on every asset of the party that does that, even in a bankruptcy proceeding. And they didn't do that. And so the Bankruptcy Court, in dealing with that plan, was required to deal with the strictures there. Why is that floating lien not something that can be inferred from the statutory trusts? Because Berger explains why. The Supreme Court explains why. There in 7501, the IRS never deposits a trust race with the debtor. It gets this trust by operation of law. Under the CEA Act, as Judge Zagel correctly held, the lien, the trust, the right to segregation, and it's not really a trust, it's a segregation right, it provides that it comes only to the customer's property. So essentially what they're saying is they should have a lien on someone else's, a trust interest on someone else's property. And the CEA says one particular customer has no interest on any other customer's property, and the House has no interest in it. And so you would be creating something that the statute by its own terms doesn't give. Yet otherwise we seem to be undermining the statutory trust and allowing the fraud to defeat that, right? But no, Your Honor, you're not, because the money isn't going back to Mr. Bloom who's in jail. The money is going to all of the victims, and that's what bankruptcy does. No, it's going to other creditors who were in a better position to be able to protect themselves. For example, if you're lending money to a trustee, somebody like Sentinel, you've got an ability to do some due diligence to see if your lien is on property that the trustee is actually entitled to lien. And Bank of New York's lien was taken away from it. The court just would not equitably subordinate them. And so the plan provides everyone is an unsecured creditor, including them. I mean they talk a lot about the plan because of how the first decision came down, but the plan very clearly puts all of the SEG 1, SEG 2, SEG 3, and SEG 4 customers in the same class as this court noted in its first decision. It treats them all as unsecured creditors, and it sets up a dispute where the trustee, really acting for the other victims here, the SEG 4, SEG 3, SEG 2 parties, disputes with FC Stone and the other SEG 1s whether they're entitled to this reserve. No one's waived any rights. The goal here is to get to some equality, and I see that I'm out of time. Counsel, there was one other thing I wanted to ask you about with the indulgence of my colleagues, which is the language in Section 7.20ci. I understand how the court might award customer property to its rightful owners. What do you think the provision means where it says the court seems to be able to award customer property to the estate? I think that that provision, because of the way that it is worded with the two determinations that the court needs to make, that it allowed the bankruptcy court or the district court judge who was sitting basically as the bankruptcy judge in connection with that particular issue to make a determination that it was appropriate to place this property. On what standard? I think to get to an equality of distribution. Even though as a result of Bank of New York, we've now been able to make a 59% distribution to the SEG 3s, the SEG 1 customers still have received 71%, 70%, 69%. It kind of depends on where they were in the various SEGs. There is still a disparity there, and that disparity, I think if you applied your equitable rule, you would even out that disparity. That's what happens in receivership cases. The Huber case, for example, the rising tide method, you equalize everybody to the same point. So if you were going to fashion a new equitable rule without regard to the confirmation order, we would suggest that what the district court judge did here with that language was to essentially provide for some further equality. Sounds like awarding some customer property to other customers via the estate. But essentially that's what they've already gotten because it wasn't their property to begin with. There's no question that this was all commingled and it wasn't traced. And they've already walked away with a 70% distribution of money that should have gone to everyone. I have one more question, and I will give you rebuttal time, and I will certainly add time to your argument. But what evidence do you have to support your assertion that Sentinel's daily allocation of securities to various customers as recorded on its customer ledger was, as you put it, essentially meaningless? It was meaningless, Your Honor. The evidence would be the various business records that were in exhibit at trial. It was the testimony of Mr. Feltman. It was the testimony of the two business folks that worked on how they allocated the securities every night. They essentially put things on one list, but then they had to move things around to deal with the Bank of New York and its demands for collateral. Okay. Thank you. Four minutes to each side. Thank you, Neal. May it please the Court. Tom Krebs on behalf of F.C. Stone, LLC. I want to start with addressing the trustee's appeal of count one, and that is his Section 549 avoidance claim. To prevail on that claim, the trustee must establish two elements. The first is that Sentinel made a transfer of property estate after the commencement of the bankruptcy case. The second is that the transfer was not authorized by the bankruptcy code or the bankruptcy court. The second element, authorization, is at issue in the trustee's appeal here. Let me just, I want to get something out of the way, because it seems in the briefs that, as though you're arguing that we should apply the rule that we pondered in dicta in the first F.C. Stone appeal to place trust claimants who fail to trace ahead of at least unsecured creditors, giving them priority in bankruptcy proceedings. Is this what you are arguing? Correct. The second part of that opinion addressing count three, which is essentially the deck action by the trustee concerning the reserves, that was dicta, yes, because this Court had already held with respect to, in fact, the Court actually said that in its opinion, it already held with respect to count one that the transfer was authorized. It didn't need to get to the second element, which is property estate. Anyway, back to count one, which is the trustee's appeal. The resolution of that appeal, it should be straightforward. The Court has already held for F.C. Stone on count one. It held that the trustee cannot bring a post-petition avoidance claim because the Bankruptcy Court had authorized a post-petition transfer. In the case law in that area, it's well established. Under the mandate rule, a lower court must adhere to a higher court's commands on remand, and any issue conclusively decided on the first appeal is not to be remanded. Under the law of the case doctrine, which is a corollary, a party cannot re-litigate an issue on remand when an appellate court already has expressly or impliedly decided it. The relevant issue here is whether the post-petition transfer was authorized, and all you have to do is look at how the trustee is framing the issue to determine that's correct. The trustee is essentially arguing that the Bankruptcy Court did not authorize the post-petition transfer because the Bankruptcy Court clarified its order authorizing the post-petition transfer one year later by its October 28th order, and it's that October 28th order, which is subsequent, that order is entitled to collateral estoppel effect. Well, the problem with this argument is that this court has already conclusively decided the authorization issue in F.C. Stone's favor, and the starting point there is the last line of this court's opinion. That line states, the judgment of the district court is reversed, and the case is remanded to the district court for further proceedings consistent with this opinion. So the relevant inquiry becomes what further proceedings consistent with this opinion relating to authorization were contained in the first F.C. Stone appellate decision. Well, the review of the opinion establishes that this court could not have been any more clear on the issue. In fact, it stated its holding on four separate occasions. I'm not going to read all of them, but I'll go through two. The first one, on page 245 of the published opinion, the post-petition transfer of $300 million was authorized by the Bankruptcy Court. That authorization means that the post-petition transfer cannot be avoided under the express terms of 11 U.S.C. section 549. This court repeated that same holding later on page 245, then on page 255. And then finally on page 258 for the final and fourth time, this court stated, we conclude then that the Bankruptcy Court authorized the post-petition transfer within the meeting of 11 U.S.C. section 549. The trustee, therefore, cannot avoid the transfer. This court could not have been any more explicit. The post-petition transfer was authorized, and that should end the inquiry. This court's clear mandate left the district court with nothing to do except to enter judgment. So what happens, counsel, next time there's a bankruptcy filing by a similar sort of company that's short on cash for its customers and creditors, the Bankruptcy Court had to make that decision under extraordinary pressure. I've read those transcripts as well. I don't remember whether you were there or some of your colleagues. And that decision had to be made very fast with huge consequences. What if the court had said, wait a minute, I need a couple of days to think about that, and then S.C. Stone and other companies would have been shorting your own customers, right? That's correct. So what do we do next? What guidance do we give for next time? With respect to whether the Bankruptcy Court should enter such an order? Yeah. Well, I think the CFTC and Judge Connelly made that point that it was a no-brainer. If the authorization order had not been entered, numerous FCMs would have failed, and that could have had extreme and significant collateral damage to the markets on the whole. On page 52 of your brief, you say the following. The CFTC has made clear that any securities that are maintained in a customer-segregated account are presumptively the property of future customers. What does it mean for funds to be maintained in a customer account? How long do they have to have been segregated for this presumption to apply? They don't have to be segregated for any amount of time. It's the point in time when the analysis is done. If they're in that account at that point in time, they are presumptively CEA trust assets, and that is the CFTC's position, and that's the position that the District Court should have adopted if it would have adopted its presumption that it said it would have in the first opinion. And if we accept your argument that funds should be presumed to belong to Segment 1 customers, how do you think that presumption would be rebutted? If the presumption is rebutted, then what? And if we accept your argument that only Segment 1 customers preserve their trust status, how do we determine whether the securities in the Segment 1 account actually were trust property? In the CFTC's view, it would be an irrebuttable presumption. If the securities are in there, that's the end of the story. That's the end of the story. No matter how they got there. No matter how. No matter how. Now, FC Stone has gone ahead and actually traced the assets, so that's another point we can make, but they are presumptively and irrebuttably CEA trust assets. Counsel, suppose the bankruptcy filing had come a couple of weeks earlier before the massive transfer of property from Segment 3 to Segment 1 accounts. Do you see any reason the Segment 3 customers could not have made, in essence, the same arguments that you have been making? It's possible that they could, although they certainly couldn't. Well, and they could make the tracing arguments as well, if they could trace their assets to those accounts. Well, is there any reason why in this sort of a situation, where we've got both CEA and Investment Advisor Act accounts with statutory trusts imposed, why you shouldn't just treat all those folks as equal? I understand the plan here has stepped in, but go back to the time of filing, the time of crisis, and, in essence, divide that money fairly, that property fairly, among the customers with accounts. No, I don't think so. I think the assets that are actually in the account, it should go to whoever's account that is. In this case, it was the FC Stone and the other Segment 1 customers. So that lets Mr. Bloom dictate, in essence, which of his customers are going to be rescued and which are not, right? Possibly. That's what you're telling us, and that's not a very satisfactory answer. The CEA trust is a very robust statutory trust. More robust than the IAA? No, I won't make that argument. Good. Could I also ask you what you think the language, giving the district judge or bankruptcy judge discretion in 7.20CI, or at least giving some power to take customer property and assign it to the estate, what that's intended to address? Sure. I don't think it gives the district court any discretion. What does it do? I understand what you think it doesn't do. I want you to tell us what you think it's there for and what it does. It strictly is a boots-and-suspenders language relating to the property estate. And if you look at 7.20A, and if you look through the entire section, the only determination that's explicitly mentioned is a determination of property estate. The first line, 7.20A, pending a determination by the court whether the assets held in the Seg1 property estate reserve, Seg2 property estate reserve, and Seg3-4 property estate reserve then parentheses, each is defined below, and collectively the property estate reserves are property of the estate. The trustee shall continue to maintain the property estate reserves as applicable. So right from the get-go, the only determination that's being made is property estate, not some discretionary determination that would allow the judge to do what he believes is equitable. If you go to 7.20C1, same thing in the first line. In the event the court determines that the property in any of the property estate reserves is not property estate, sections 4.4 and 4.5 of the plan shall be de-modified to provide that property shall be distributed to the rightful owners of such property or to the estate, and then there's that clause that you've been talking about as determined by the court. That is just boots-and-suspenders. You left out the word customer, customer property. How does customer property, what power does the judge have to distribute customer property to the estate? Customer, well, that depends. I mean, customer property is just property that should have been held by Sentinel for its customers. That determination is made by the sections of the plan, sections 4.4 and 4.5 of the plan. They provide that customers shall share pro rata with unsecured creditors in all property, including customer property. Sections 4.5A and 4.5C provide that this pro rata general distribution scheme is subject to section 7.20, which is the one we just talked about. Section 7.20, it sets up the reserves. Section 7.20A1, that's the Seg1 reserve that we've been talking about. Section 7.20C, that's the provision that I just read. It provides that if the property in the reserves is not property estate, then the distribution schemes in sections 4.4 and 4.5, they don't apply in the reserve property. It should be distributed to the rightful owners, which in this case would be the Seg1 defendants. Well, I may have missed something. I may have missed a lot. But are you arguing that Seg1 clients should receive priority over the reserves without putting forth any evidence of ownership, aside from the fact that the securities were in your account when Sentinel filed bankruptcy? Is that your argument? The point that F.C. Stone is making is that the district court should have adopted some tracing presumption. And we say that the most logical presumption, at least in our view, is the presumption set forth by the CFTC. Now, is that the only presumption that the district court could have adopted? No. The district court could have adopted any other presumption to reach the same purpose. So it's a long way of saying no to the answer to your question. And if we agree with you that the district court's reasons for rejecting Ms. McCloskey's expert testimony were flawed, do we have to remand the case for further fact-finding? Or do we enter judgment in your favor? What do we do here? I'm sorry. Could you repeat that question one more time? I'm not sure. I apologize. Let's see. If we should think that the district court was flawed in his thinking when he totally rejected Ms. McCloskey's expert testimony, do we have to remand for further fact-finding? Or do we just, you know, enter judgment in your favor? Well, I think there are facts that are sufficient in the record for this court to enter judgment on the tracing issue alone, which would resolve all of these issues. Which of, you know, well. How do you respond to Ms. Stege's argument about, you know, tracing? Okay, first. Oh, you took a deep breath. Well, there's a lot to bite off here, Your Honor. First of all, it's clear that Mr. Feltman didn't trace and he didn't try to trace, and you will be able to find those citations in the record. The fact is, Mr. Feltman, when he was first deposed, he wasn't even familiar with Sentinel's customer ledger. That is the key, as any employee of any FCM will tell you, to actually tracing CEA customer assets. He didn't even know what it was. Mr. Feltman relied strictly on the trade blotter, and that's not sufficient to do an analysis of tracing because this is digging way into the weeds. But the trade blotter, it only identified the securities by SAG. Okay, so there were SAGs, and then within each SAG there are groups. And FC Stone happened to be in Group 7 of SAG 1. So if you look at the trade blotter, you can't trace because different entities within SAG 1 had different pools, and FC Stone was within the Group 7 customer pool. So the fact is, Mr. Feltman didn't trace. And if you look through the papers, you'll also see that Ms. McCloskey did. First she looked at the Sentinel's date of purchase. Then she looked at the key point, which is the date of allocation, and the date of allocation was when, for instance, FC Stone would transfer cash into a customer-segregated account. At that moment, there was an allocation exchange, and then cash went out. Not until there was that allocation exchange did the cash go out. So that was the relevant purchase, and I realize I'm digging into the weeds. And then from that moment on, she traced it to when the securities were sold to Sentinel and eventually made their way into the SAG 1 account. So she did do a tracing exercise. And to add on top of that, the district court, at least in its first opinion, made a number of legal errors relating to tracing that also affected it as well. And you should note that in its second opinion, the district court stated that an understanding of Sentinel's repo business was essential because it helped establish that FC Stone couldn't trace. Well, the district court didn't have any understanding of Sentinel's repo business, at least by the second opinion. The district court said that Boney was Sentinel's repo party. Well, that's not true. FEMAT and Cantor Fitzgerald were. The Bank of New York merely financed the haircut on the repo. The district court also appeared to believe that the securities used in the repo were owned by customers. But once again, that wasn't true either. Those securities were owned by the repo counterparties, which is what happens in every repo transaction. And finally, the district court believed that the interest on the repo securities went to the Bank of New York. Well, this statement is the oddest statement of all because the Bank of New York was not even a repo counterparty. The interest on these securities went to Sentinel, which once again is customary in the industry. So the number of errors that were committed relating to tracing are legion, and they're set forth in our brief. Mr. Crooks, can I ask you, what do we do? I understand you can follow money in from your client and other similar customers of Sentinel, but what do we do with the fact that interest allocations to each of those accounts seem to have been quite arbitrary? Okay, well, I think that issue is off the table in this case because the trustee's expert, Mr. Feltman, specifically said with respect to interest that Sentinel made a significant attempt to match interest accrued and allocated to customer accounts to actual earnings the security reflected for customers. And the citation there is CA 1661 and 1799. That admission should be binding. So close enough for horseshoes? Very close. And the other point is this. We're now talking about a small part off the top of the entire piece, if we're talking about interest, and Mr. Feltman said that almost all of that part was accurate as well. So now you're talking about an even smaller part. The froth on the top. Right. Very thin. Okay. You're going to have to wrap it up. Thank you. Can I make one more point? Make one more point. Okay. And then go home. No, you know what? I'm going to take your advice, Your Honor. I'll go home right now. No, no, no. If you have a point that you need. No, that's okay. Really? Yeah. You'll be sorry. I'll find out when I walk over back. All right. Thank you. Okay. Okay. Thank you, Your Honor, for letting me just do a few rebuttals. First, in response to Judge Hamilton's question, Moiti v. Federated Department stores there. Five of seven parties who lost appealed up to the Court of Appeals where the order was reversed. The other two attempted to sue in state court. It got remanded back. The order was already declared to be wrong, and the court said, sorry, you're going to sue camp procedure bound by collateral estoppel. So the Supreme Court has held that the fact that an order has already been declared wrong can be used in that way. With regard to your question about what do we do, I mean, I think the focus here has always been on this market collapse by the FCMs. Well, we're ignoring the fact that there were 300 or so other investment firms that were at Sentinel. Lakeshore Investments is in a receivership right now. They were a seg three party. They had investors that lost money. There were parties that failed as a result of the fact that all of the available assets were cleaned out for the seg ones right before the bankruptcy, and the trustee had to work through litigation and other means to get any funds to be able to pay the others. So I think that right now, as the rule stands, Judge Squires thought he was doing rough justice by allowing the ability to bring money back into the estate if there was something wrong with what he was being told. The parties all understood that who were there, including FC Stone, and now the rule of law is, well, if the parties draft the order in a way that can be read a different way, you're out of luck, and that money stays where it shouldn't have gone because, as Judge Zagel correctly found, it was a game of musical chairs. Wherever it ended up, had this case ended on July 30th, the seg threes would be the ones standing here saying they're in the So I think you have to resort back to what Congress did under the Bankruptcy Code, and in a Chapter 11 case like this, with Cunningham v. Brown, which has been on the books since 1924, no one's overruled it. Congress could have legislated it out of existence when it enacted the code, and the presumption is if it didn't do that, pre-code bankruptcy law survived. It's been applied post-code. This court supplied it in other contexts. That was really the way to proceed here, is to do what Judge Zagel did, which is to do equality with what funds remained. With regard to Mr. Feltman's testimony, at page CA1011 of their appendix, they quote a portion of his expert report, and that indicates what I was saying, is that his testimony was that you can't trace because of the nature of what you are doing to trace. And I would just suggest Judge Zagel sat through an 11-day trial with 14 witnesses, and what you have here in these appendixes that F.C. Stone put together are selected excerpts that they think favor them. He heard all of these arguments that you heard today about what ledgers somebody should have looked to and the rest, and he rejected them. Well, F.C. Stone says, as I recall, that Mr. Feltman conceded that he wasn't hired to trace customer assets and that he didn't review or rely on Sentinel's customer ledger. So wouldn't that essentially mean that the analysis provided by Ms. McCloskey is essentially unrebutted? No, Your Honor, because he explained why what she was doing wasn't tracing, and they admit it. They say the only way they can trace, without a presumption that the funds in the account, the name on the account controls, which is the case law that we cite rejects, without a presumption of the lowest intermediate balance rule, without a presumption that anything that goes back in was an attempt to rectify the fraud, without those presumptions, she said you could never trace. And so even if she was the only expert, the court could have rejected her testimony. She said you cannot correlate the dollars in with a particular security. She said that. Okay. Well, thank you all very much. The case will be taken under advisement, and the court appreciates the arguments.